# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**AARON DAVIS,**

     Plaintiff,

     v.

**TYLER W.A. DUNCAN, et al.,**

     Defendants.

CASE NO. 3:22 CV 614

JUDGE JAMES R. KNEPP II

**MEMORANDUM OPINION AND ORDER**

### INTRODUCTION

Currently pending before the Court is Defendants Hardin County, Marion County, Dale R. Osborn, Brandon Taylor, and Marion-Hardin Correction Commission's (hereinafter "County Defendants" or "Defendants") Motion for Summary Judgment. (Doc. 53).[1] Also pending is Plaintiff Aaron Davis's Motion for Leave to file Second Amended Response in Opposition. (Doc. 60). Both motions are fully briefed and ripe for decision. Jurisdiction is proper under 28 U.S.C. § 1331. For the reasons set forth below, the Court denies Plaintiff's Motion for Leave, and grants County Defendants' Motion for Summary Judgment.

### BACKGROUND

This case arises out of a use of force by Defendant Tyler Duncan, a correctional officer, on Plaintiff while he was incarcerated at the Multi-County Correctional Center ("MCCC") on

---

1. Defendant Tyler Duncan is separately represented and not a party to this motion. Any reference to "Defendants" herein refers to the above County Defendants and does not include Duncan.

April 17, 2020. Defendant Dale Osborn was the Executive Director of MCCC at all times relevant. (Osborn Depo., Doc. 47, at 9-10).[2]

<u>Use of Force Incident</u>

On the date in question, Duncan escorted Plaintiff to and from his cell to see the nurse. (Duncan Depo., Doc. 51, at 45). On their return, Plaintiff asked Officer Samantha High about using the phone; she denied the request. *Id.*; High Depo., Doc. 50, at 14-15. At that point, Duncan escorted Plaintiff into the cell and they got into an argument over how Plaintiff was speaking to High. (Duncan Depo., Doc. 51, at 45). Plaintiff and High were yelling back and forth; Duncan "was yelling at [Plaintiff,] [']are you going to respect us[?']" *Id.* Although it is disputed how it happened, it is undisputed that Plaintiff ultimately went to the ground and hit his head on the wall. (Davis Depo., Doc. 46, at 80) ("[H]e grabbed me and slammed me against the wall, and my head hit the back of the wall"); (Duncan Depo., Doc. 51, at 45) ("He put his hands up, grabbed me by my shirt . . . and I literally grabbed him, we spun around, we went to the ground, and he hit his head off that privacy wall"). High did not see the incident (High Depo., Doc. 50, at 14-15), and the MCCC surveillance video shows Plaintiff enter the cell and Duncan close the door to the cell behind him, then Duncan reopened it and entered the cell (Ex. A4, Surveillance Video, 3:10:22-:39). The video does not clearly depict the inside of the cell or the use of force incident itself. *See id.* Duncan was not permitted to enter Plaintiff's cell under these circumstances, and he knew that. (Duncan Depo., Doc. 51, at 96-98). No other named Defendant was present for the events at issue. Duncan was later criminally convicted of assault for his actions. *Id.* at 8.

---

2. All citations herein to deposition transcripts are to the internal deposition transcript page number, not the ECF filing page number.

Plaintiff testified that prior to this incident, he had not had any previous interaction with Duncan. (Plaintiff Depo., Doc. 46, at 70). Plaintiff also testified that he did not have any problems with Duncan during the time he was escorted to or from the nurse's station. *Id.* at 73, 76 (describing Duncan's demeanor as "fine").

Duncan's Background

Duncan previously worked at a juvenile facility, the North Central Ohio Rehabilitation Center, in Marion, Ohio. (Duncan Depo., Doc. 51, at 9-10, 15-16). He was written up once there for a use of force incident. *Id.* at 15. Duncan described the incident as follows:

> A. A kid cornered himself into a corner. We were trying to -- we talked him down for like 10, 20 minutes. Nothing was happening. Finally I stepped in and grabbed him and wrapped him up, and we went to the floor, but because it's a juvenile obviously it's very like you're not supposed to touch them at all but when a kid's throwing chairs at you it's kind of --
>
> Q. How old was the kid?
>
> A. I want to say 16.
>
> Q. Did the kid suffer any injuries?
>
> A. No, some rug burn.

*Id.* Although Duncan was written up, he was not otherwise disciplined and was not terminated over the incident. *Id.*[3] He told the interviewers at MCCC about this incident during his interview. *Id.* at 18, 42.

---

3. This testimony, indeed the only testimony any party has pointed the Court to regarding this incident, is in direct contrast to Plaintiff's entirely unsupported characterization that "Duncan worked at a juvenile rehabilitation facility, *where he was terminated* for an incident involving excessive force against a 16-year-old detainee. During his tenure, he physically tackled the minor into a corner, leaving the child injured. This incident was documented and *directly led to his dismissal*." (Doc. 57, at 6) (emphasis added). And, indeed, Plaintiff provides no record citation for his unsupported factual statement, and in his motion for leave (Doc. 60) acknowledges that this was incorrect. *See id.* ("Defendants briefly contest the distinction between 'termination' and 'disciplinary write-up'[.]").

Duncan was also employed at Marion Correctional Institution. *Id.* at 10. He was fired because "they thought [he] was bringing in drugs" after an investigation. *Id.* at 10-11. However, he testified it was actually a nurse he was dating that committed the crime and his name was later cleared. *See id.* at 10 ("I was dating a nurse, and the nurse said that I had large sums of money so they assumed I was bringing in drugs, and they fired me, and come to find out it was her."); *id.* at 16-17 (explaining that "they dropped all the drug stuff"). He also told MCCC about this incident during the interview process. *Id.* at 18, 42.

During the investigation into the incident at issue in the instant case, Sergeant Andrew Jones, Plaintiff's supervisor, reported to the Marion Police Department two incidents involving Duncan at MCCC. *See* Doc. 53-3, at 13. In one incident:

> Sgt. Jones said that Duncan tried to open a cell door and go in on an inmate that was high on meth and yelling at Duncan. Sgt. Jones had to pull the keys out of the lock and pull Duncan's hands away from the door and shut the door. Sgt[.] Jones documented this with an incident report. The inmate was yelling[,] "I'm gonna beat your ass".

*Id.* Duncan testified about this incident. (Duncan Depo., Doc. 51, at 124-26). At his deposition, Duncan agreed with counsel's characterization that it involved an inmate potentially high on methamphetamines; Duncan testified he wanted to go into the cell to prevent the inmate from "[h]arming himself" when Jones (his supervising officer) stopped him. *Id.*; *see also id.* at 37 ("There was one instance where a guy was slamming his head off the doors and walls in booking and I tried to go in and grab the guy. I wasn't, like, going to go in and hurt him or anything. I was literally going to restrain him because this guy had blood running down his face. And he stopped me and took my keys and said I was not to open the door.").

In a second incident Jones described that is documented in the police report:

> Sgt. Jones said they had a[n] . . . inmate in booking that had chicken skin on his legs and was digging at it. Duncan told the inmate[,] "If you keep digging at that,

4

> I'm going to punch you in the fucking throat." Sgt. Jones shot his head up and
> told Duncan[,] ["]you can't say that.[""]. Duncan said[,] "what do you mean I say
> stuff like this all the time." Sgt. Jones said[,] ["]well if you are, you need to
> stop.["] Sgt. Jones reported the incident to his lieutenant.

(Doc. 53-3, at 14). Duncan also testified regarding this incident in his deposition, stating that he

made the comments "in a joking manner", but agreed that "on paper, yes, that looks very bad."

(Duncan Depo., Doc. 51, at 38). He stated Jones "wrote [him] up" for the incident and they "had

like a little argument". *Id.* He agreed that the write-up was a form of discipline. *Id.* at 38-39.

Correctional Officer Training

In his previous job at Marion Correctional Institution, Duncan attended a month-long

academy for training through the state in Orient, Ohio in 2018 (including trainings in self-

defense, OC spray (pepper spray), talking down/de-escalation techniques). (Doc. 51, at 11-12,

111-12, 157). That course included response to resistance training and de-escalation techniques.

*Id.* at 112. After completion of the course, he received a  certificate that certified him to be a

correctional officer. *Id.* at 12, 157. MCCC was aware he had undergone this prior training. *Id.* at

21-22, 35-36.

Duncan was hired by MCCC on November 10, 2019. *Id.* at 153; *see also* Doc. 51-1, at 8.

MCCC required new correctional officers to attend a 40-hour in-class training session within the

first two to three months of employment. (Osborn Depo., Doc. 47, at 41-42, 113). Duncan

attended such a training. (Duncan Depo., Doc. 51, at 107); *see also* Doc. 51-1, at 8 (listing

orientation training dates of December 2-6, 2019). New officer training at MCCC also included a

self-taught Response to Resistance/Aggression Correspondence Course and examination.

(Duncan Depo., Doc. 51, at 22-23). This examination was open book. *Id.* at 23. He did not

receive feedback on the examination, *id.* at 23, but they "went through it", *id.* at 113. He testified

that the material included information he knew from his prior training and that it was a sufficient

refresher of that material. *Id.* at 114, 156-57. Duncan also testified that the training included a full-day session, running from 8:00 a.m. to 3:00 p.m. regarding response to resistance, aggression, and unarmed self-defense policies. *Id.* at 108. This training included videos to help understand the response to resistance and aggression policy. *Id.* at 109. Duncan took that training seriously. *Id.* at 109-10. Duncan also shadowed other officers as part of his onboarding, but he remarked, "[s]ome officers don't take it very serious at all." *Id.* at 33.

Duncan also testified that he thought "[e]very new officer is under-trained" and "[y]ou are thrown into the wolves without any training." *Id.* at 31. When asked if he thought he should have received more training, he responded: "Yeah, I think when I stepped away, you know, I think I could have used the training. I actually wanted to do the OPOTA[4] stuff to get certified to be a transport officer." *Id.* at 31.

Osborn testified that he consulted with Captain Romine to ensure new hires received proper training and "trusted Captain Romine to ensure that this was getting done." (Osborn Depo., Doc. 47, at 48). He did not recall having conversations with Captain Romine or anyone else regarding Duncan's training or work history, but believed if anyone had expressed concerns regarding hiring Duncan, he would recall that. *Id.* at 48-50.

STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine

---

4. OPOTA stands for Ohio Peace Officer Training Academy.

the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those *specific* portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials"); *see also* Fed. R. Civ. P. 56(e) (identifying a court's options when a party fails to properly support an assertion of fact).

## DISCUSSION

### Motion for Leave

At the outset, the Court turns to Plaintiff's Motion for Leave. (Doc. 60). Therein, Plaintiff requests leave to file a *second* amended response in opposition to Defendants' motion for summary judgment. Defendants oppose and request sanctions. (Doc. 61).

Some procedural background is necessary for context here. On November 8, 2024, County Defendants filed their motion for summary judgment. (Doc. 53). On November 29, Plaintiff filed his (first) opposition thereto. (Doc. 55). This document contained no record citations. One week later, on December 6 (and still within the allowed 30-day time period to file an opposition), Plaintiff filed a motion for leave to file an amended response to the summary

judgment motion. (Doc. 56). Therein, counsel stated that "[t]he originally filed version was an incorrect version, that does not contain proper deposition citations." *Id.* at 1. The Court granted the motion, and ordered the amended opposition filed by December 13, 2024. Plaintiff complied. (Doc. 57).[5] On January 10 (after being granted a short extension of time), Defendants filed their reply brief. (Doc. 59). In that reply brief, Defendants pointed out Plaintiff's opposition brief contained numerous mischaracterizations of the record, as well as factual assertions presented with no record support. (Doc. 59, at 1-2). They "object[ed] to each of Plaintiff's alleged factual assertions that are unaccompanied by a proper and accurate citation to the record." *Id.* at 2 (citing Fed. R. Civ. P. 56(c)(2)). Almost two full months later, on March 6, 2025, Plaintiff filed the currently-pending Motion for Leave to File Second Amended Opposition. (Doc. 60). He attaches the proposed second revised opposition thereto. (Doc. 60-1).

Plaintiff states he "seeks this amendment to ensure that the record reflects the accurate and well-supported basis for opposition to Defendants' motion, and to aid the Court in reviewing the record" and "remove[] any inadvertent misstatements of the record." *Id.* at 1. He contends that there is no prejudice to Defendants in allowing the amendment. *Id.* Defendants vehemently disagree, noting they had already filed a reply based on Plaintiff's first amended opposition and invested significant time and resources to do so and that to file a new reply to Plaintiff's proposed *second* amended opposition would require even more. (Doc. 61). Defendants also contest whether Plaintiff can claim inadvertence "despite submitting" certain arguments and assertions "twice for the Court's review." *Id.* at 3. It notes that Plaintiff's proposed second

---

5. The Court notes that Plaintiff's amended opposition also does not comply with this Court's rules, which require filings to be "double-spaced except for quoted material." N.D. Ohio Local Civ. R. 10.1(a). Plaintiff's brief is one-and-a-half spaced. *See* Doc. 57.

amended opposition simply deletes entire paragraphs that Defendants had highlighted as containing unsupported assertions. *Id.* at 3-4.

At this juncture, after one amended opposition has been allowed precisely for the purpose of fixing previously-absent record citations, and Defendants have filed their reply brief, the proposed filing is no longer an "amended opposition" but a sur-reply that attempts to reformulate arguments specifically in response to the arguments made in Defendants' reply. And such sur-replies are typically not permitted absent some good cause, such as new arguments raised in a reply brief. *See, e.g.*, *Conteers LLC v. City of Akron*, 2021 WL 252540, at *5 (N.D. Ohio). No such argument is presented here that a sur-reply would be appropriate, nor does the Court find it would.

The Court declines to give Plaintiff what is essentially a *third* bite at the apple. Although the Court acknowledges counsel's representation that a health issue impacted the timing of the filing, this is offered as a justification for the two-month delay following the filing of the reply brief. It does not provide justification for failure to correct the brief the first time it was amended after counsel himself noted the first version "does not contain proper deposition citations." (Doc. 56, at 1). The currently-pending motion for summary judgment will be considered with Plaintiff's first amended opposition, to which the County Defendants have replied. *See* N.D. Ohio Local Civ. R. 7.1(c) (allowing response to motion and reply to response); *ACLU of Ky. v. McCreary Cnty.*, 607 F.3d 439, 451 (6th Cir. 2010) ("[A] district court has broad discretion to manage its docket."). And the Court will not consider factual statements in that brief that are either (1) not supported by any citation to the record, or (2) not supported by the record citation listed. *See Emerson v. Novartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) ("'[J]udges

are not like pigs, hunting for truffles' that might be buried in the record.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)); Fed. R. Civ. P. 56(c), (e).[6]

The County Defendants also request sanctions pursuant to Local Rule 7.1(i) for the attorneys' fees incurred in the drafting their opposition to Plaintiff's motion. Local Rule 7.1(i) provides that "[f]iling a frivolous motion or opposing a motion on frivolous grounds may result in the imposition of appropriate sanctions including the assessment of costs and attorneys' fees

---

6. The Court provides two brief examples. In one place, Plaintiff's brief states:

> Duncan's deposition revealed that the facility operated under what he described as a "brotherhood" among officers—a culture where misconduct was normalized and accountability was virtually nonexistent. Officers routinely manipulated or falsified incident reports to conceal their excessive use of force. Surveillance cameras were deliberately avoided during questionable actions to ensure that no record of misconduct would exist. This tacit encouragement of unethical behavior created an environment where officers felt emboldened to act without fear of consequences. (Duncan, Doc. 51, at 40).

(Doc. 57, at 5-6). The single deposition page citation cited for this lengthy factual allegation consists only of Duncan's description of two instances in which he used "force" on inmates – once when assisting an inmate who had attempted to commit suicide by hanging, and once when an inmate was refusing to shower and had to be handcuffed and removed. (Duncan Depo., Doc. 51, at 40). This page provides no support for any of the statements preceding it.

In a second section of Plaintiff's brief, he states:

> Additionally, the relationship between Sergeant Andrew Jones and Officer Tyler Duncan at the Multi-County Correctional Center (MCCC) was marked by prior incidents that highlighted Duncan's pattern of misconduct and Jones's awareness of these issues. Sergeant Jones previously documented concerns regarding Duncan's behavior, including instances of excessive force and unprofessional conduct. Despite these documented concerns, corrective actions were either insufficient or entirely lacking, allowing Duncan's inappropriate behavior to persist unchecked. (Cox, Doc. 49, p. 30-32).

(Doc. 57, at 7-8). The pages cited include testimony by Cox that she (1) was not aware of any instance where Duncan had been disciplined during his employment, (2) had no understanding of Duncan having any issues with anger or violence; and (3) had not personally observed any correctional officers violating MCCC polices or procedures. (Cox Depo., Doc. 49, at 30-32). Again, this citation does not support the facts preceding it.

10

against counsel and/or the party involved." N.D. Ohio Local Civ. R. 7.1(i). Although the Court is troubled by the mischaracterizations of law and fact at issue here with no clear explanation as to how they were initially made, it declines to impose sanctions at this time.

<u>Motion for Summary Judgment</u>

In his Complaint, Plaintiff brings claims under 42 U.S.C. § 1983 for excessive force and unreasonable seizure based on the Fourth Amendment (Count One) and for failure to protect under the Eighth Amendment (Count Two). (Doc. 1, at 10-12). He further separately pleads a claim against Osborn for supervisory liability under 42 U.S.C. § 1983 (framing this as deliberate indifference in violation of the Eighth Amendment) and a *Monell* claim against the Counties and MHCC. *Id.* at 10-11, 12-15.

The County Defendants move for summary judgment on all claims against them, arguing: (1) Marion and Hardin Counties are not proper parties to the suit; (2) Taylor is entitled to summary judgment, as Plaintiff cannot establish a claim against him; (3) they are entitled to summary judgment on the Fourth Amendment claim because they cannot be held vicariously liable for Duncan's conduct; (4) Plaintiff cannot establish an Eighth Amendment failure to protect claim; (5) Plaintiff cannot establish a claim for supervisory liability against either Osborn or Taylor; (6) Plaintiff cannot establish a *Monell* claim; and (7) Plaintiff cannot establish entitlement to punitive damages. (Doc. 53). Below, the Court addresses the claims against the individual Defendants first, and then the claims against the municipal Defendants.

**Claims Against Individual County Defendants**

In his original Complaint, Plaintiff named three individual Defendants: Duncan, Taylor, and Osborn. In response to the County Defendants moving for summary judgment on any claim against Taylor, Plaintiff states he is withdrawing the claims against Taylor. (Doc. 57, at 17). The

11

Court therefore grants summary judgment to Taylor. With Plaintiff's claims against Taylor abandoned, Osborn remains the only individual County Defendant.

As the County Defendants point out, the allegations in Count One, the Fourth Amendment claim, are directed toward Duncan, rather than any County Defendant. *See* Doc. 1, at 10-11. And, as the County Defendants correctly assert, they cannot be simply held vicariously liable for Duncan's conduct. *See D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014) ("A municipality may not be held liable under § 1983 on a *respondeat superior* theory—in other words, '*solely* because it employs a tortfeasor.'") (quoting *Monell v. Dep't of Soc. Serv.* 436 U.S. 658, 691 (1978)); *Iqbal*, 556 U.S. at 676 ("[O]ur precedents establish . . . that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*.").

By contrast, the Complaint frames Plaintiff's claims against the County Defendants in Counts Two and Three as arising under the Eighth Amendment, including Plaintiff's supervisory liability claim against Osborn. *See* Doc. 1, at 11-13. Plaintiff provides no direct response to this argument nor presents any argument that any County Defendant violated his Fourth Amendment rights. The Court agrees with Defendants that Plaintiff cannot hold any Defendant liable simply on a theory of vicarious liability. The County Defendants are therefore entitled to summary judgment on Count One. The Court addresses Plaintiff's Eighth Amendment, supervisory liability, and *Monell* claims below.

Defendants further move for summary judgment as to any claim against Osborn, arguing he is entitled to qualified immunity on any Eighth Amendment claim and there is no evidence to support a supervisory liability claim. The Court agrees.

12

### Deliberate Indifference

Plaintiff's Complaint asserts Defendants' "actions and inactions constituted deliberate indifference to Plaintiff's right to be free from serious risks of bodily harm in violation of 42 U.S.C. § 1983 and his rights under the Eighth Amendment to the United States [C]onstitution to be free from cruel and unusual punishment." (Doc. 1, at 12). At the outset, the parties appear to agree that Plaintiff's § 1983 claims arise under the Eighth, rather than Fourteenth Amendment. *See* Doc. 1 (framing claims as arising under the Eighth Amendment); Doc. 53, at 11 ("Analysis of the remainder of Plaintiff's § 1983 claims under the Eight[h] Amendment is appropriate."). The County Defendants note, however:

> While Plaintiff was sentenced on April 23, 2020, he was sentenced for a violation of parole for an existing charge entered December 11, 2019. Exhibit A-3 at 6-7. He was also granted credit for the time already served at MCCC. *Id.* However, if the court were to conclude that plaintiff was a pretrial detainee and thereby warranting analysis under the Fourteenth Amendment, then Plaintiff's claims pled under the Eighth Amendment should be dismissed. See *Brawner v. Scott Cnty.*, 14 F.4th 585, 596 (6th Cir. 2021).

(Doc. 53, at 11). Plaintiff does not respond to this argument, nor make any attempt to argue that his deliberate indifference claims should be evaluated under the Fourteenth, rather than Eighth Amendment. Courts are split on whether an individual being held for a suspected parole or probation violation is to be treated as a pretrial detainee or a convicted prisoner. *See Green v. Taylor*, 2023 WL 415502, at *4 (W.D. Mich.) ("The issue of whether a person confined during the pendency of probation violation proceedings should be treated as a pretrial detainee or a convicted prisoner for purposes of a constitutional challenge to jail conditions is an issue upon which courts have differed.") (collecting cases). Because the law in this area is unsettled, Plaintiff brought his claims under the Eighth Amendment, and he has not presented any

13

argument that the Fourteenth Amendment should apply to his circumstances, the Court finds he has waived any such argument and proceeds to analyze his claims under the Eighth Amendment.

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of . . . inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). A prison official is liable under the Eighth Amendment for failure to protect an inmate when: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). For the objective prong, a plaintiff must demonstrate that "he is incarcerated under conditions posing a substantial risk of serious harm." *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (quoting *Farmer*, 511 U.S. at 833). For the subjective prong, a plaintiff must show that a prison official "kn[ew] of and disregard[ed]" that risk. *Farmer*, 511 U.S. at 837; *see also Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001). Deliberate indifference "entails something more than mere negligence." *Farmer*, 511 U.S. at 835.

The Court agrees with County Defendants that Plaintiff has not pointed to evidence establishing an issue of fact regarding either prong of such a deliberate indifference claim. First, despite Plaintiff's attempts to characterize Duncan as a loose cannon with a propensity toward violence, Plaintiff has not presented evidence that Duncan's mere presence in the prison presented "conditions posing a substantial risk of serious harm" or an "excessive risk to inmate health and safety." *Farmer*, 511 U.S. at 837. As Defendants point out, there is no evidence of any history of animosity between Duncan and Plaintiff; indeed Plaintiff testified he had not had any previous interactions with Duncan. *See* Plaintiff Depo., Doc. 46, at 70. And the three instances Plaintiff identifies as demonstrating the risk Duncan posed (the juvenile facility incident and the two incidents described by Sergeant Jones) simply do not rise to the level of

showing the "substantial risk of serious harm" or "excessive risk to inmate health and safety" as required to demonstrate deliberate indifference.[7]

Second, the County Defendants contend that "there were no facts from which an inference could be drawn that Duncan posed a substantial risk of serious harm to Plaintiff, and therefore, no inference was actually drawn", arguing that there is an absence of material fact regarding the subjective prong of a deliberate indifference claim. (Doc. 53, at 15). Plaintiff does not directly respond to this argument and has pointed the Court to no evidence that Osborn (the only remaining individual County Defendant) subjectively perceived any such substantial risk posed by Duncan and "disregarded" it.

### Supervisory Liability

Plaintiff also seeks to hold Osborn liable for the incident on a theory of supervisory liability. (Doc. 1, at 12-13).

"[T]o succeed on a supervisory liability claim, [a plaintiff] must show that 'a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.'" *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 865 (6th Cir. 2020) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)); *see also Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) ("Plaintiff must show that the supervisors

---

7. The Court would reach the same result under the Fourteenth Amendment standard applicable to pretrial detainees. Pretrial detainees may sue jail officials for failing to prevent harm under the Fourteenth Amendment's objective standard. *See Westmoreland v. Butler Cnty.*, 29 F.4th 721, 728 (6th Cir. 2022). To state a failure-to-protect claim, a pretrial detainee must allege that an official acted in a manner that: (1) was intentional; (2) put the plaintiff at substantial risk of serious harm; (3) failed to take reasonable steps to abate that risk; and (4) actually caused the plaintiff's injuries. *Id.* at 729-30. "[The Sixth] Circuit has now explicitly taken the position that a failure-to-protect claim by a pretrial detainee requires only an objective showing that an individual defendant acted (or failed to act) deliberately and recklessly." *Id.* at 728 (citing *Brawner v. Scott Cnty., Tenn.*, 14 F.4th 585, 596 (6th Cir. 2021)). For the same reasons stated above, Plaintiff has not pointed to evidence that "an official acted in a manner that . . . put the plaintiff at substantial risk of serious harm" or acted objectively "deliberately and recklessly." *Id.*

somehow encouraged or condoned the actions of their inferiors."). This "requires some 'active unconstitutional behavior' on the part of the supervisor." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)). In short, a plaintiff must plausibly allege that a supervisory defendant "authorized, approved, or knowingly acquiesced in the unconstitutional conduct . . . of his subordinates through the execution of his job functions." *Id.* at 242; *see also Essex v. Cnty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013) ("There must be some conduct on the supervisor's part to which the plaintiff can point that is directly correlated with the plaintiff's injury."); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) ("[A] supervisory official's failure to supervise, control or train the offending individual is not actionable *unless* the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it.") (emphasis added).

"[S]upervisory liability also has sharp limits." *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021). It will not attach for "a mere failure to act." *Peatross*, 818 F.3d at 241. "[A] supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another." *Id.*; *see also Winkler v. Madison Cnty.*, 893 F.3d 877, 898 (6th Cir. 2018) ("[L]iability cannot be imposed on a supervisor under § 1983 based on the theory of respondeat superior."). And supervisory liability requires more than negligence or recklessness. *Garza*, 972 F.3d at 866.

Moreover, in addition to showing active unconstitutional conduct, a claim of supervisory liability requires a plaintiff to show a "causal connection" between the defendant's "active unconstitutional behavior" and the plaintiff's injuries. *Peatross*, 818 F.3d at 242; *see also* 42 U.S.C. § 1983 (extending liability to any state actor who "subjects, or causes [a person] to be

subjected" to a violation of their constitutional rights). "The challenged conduct must be both a cause in fact and a proximate cause of the alleged injury." *Crawford*, 15 F.4th at 761-62.

Further, the Sixth Circuit has found that – without such personal involvement – an attempt to hold an officer liable in his individual capacity for his "alleged failure to adequately train employees . . . 'improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability.'" *Harvey v. Campbell Cnty.*, 453 F. App'x 557, 563 (6th Cir. 2011) (quoting *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008)); *see also Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 646-48 (6th Cir. 2012) (finding that absent evidence of personal involvement in the alleged underlying misconduct, the individual defendant could not be individually liable based on her failure to train or supervise). Thus, absent personal involvement, a failure-to-train claim against an individual official is properly deemed to be brought against them in their official capacity, and treated as a claim against the municipality. *See Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005).

The County Defendants cite Davis and Duncan's deposition testimony that Osborn was not in the area at the time of the incident. (Davis Depo., Doc. 46, at 85); (Duncan Depo., Doc. 51, at 150). And Osborn testified there was a prompt investigation into Duncan's conduct. (Osborn Depo., Doc. 47, at 164-65).

In response, Plaintiff relies on non-binding district court caselaw from the District Court for the Eastern District of Virginia and the Middle District of North Carolina, citing Fourth Circuit caselaw for the applicable standard. (Doc. 57, at 17-19). But this Court sits in the Sixth Circuit, and the relevant standard for § 1983 supervisory liability is set forth above.[8]

---

8. Moreover, although not dispositive of the issues before the Court, the Court would be remiss if it did not note that Plaintiff also misrepresents the caselaw he cites. Comparing the instant case to *Keeton v. Dudley*, 753 F. Supp. 3d 444 (E.D. Va.), Plaintiff states that Osborn's "lack of

Plaintiff contends that Osborn, in his capacity as Director of the MCCC "had actual and constructive knowledge of the pervasive risks posed by . . . . Duncan" and further asserts "MCCC leadership, under Osborn's direction, failed to adequately vet [Duncan] before hiring[.]" *Id.* at 18. But he provides no accurate record citation to support this claim. For this proposition, Plaintiff cites page 45 of Osborn's deposition and pages 18-19 of Duncan's deposition. The referenced pages of Duncan's deposition simply reflect testimony regarding the questions he was asked prior to being hired and how he responded. (Duncan Depo., Doc. 51, at 18-19). Duncan testified that he told the interviewer about his previous employment including the incident at the juvenile facility and the investigation at Marion Correctional. *Id.* at 19. And the referenced page of Osborn's deposition contains testimony regarding the oath of allegiance administered to correctional officers. (Osborn Depo., Doc. 47, at 51). Finally, Plaintiff contends that "Osborn also had knowledge of repeated complaints regarding Duncan's behavior while at MCCC, including documented incidents of excessive force and unprofessional conduct reported by other staff members." (Doc. 57, at 18). But for this proposition, Plaintiff cites pages 29-30 of Cox's deposition, which involve a description of conduct that occurred *after* the use of force incident. *See* Cox. Depo., Doc. 49, at 29-30.

The Court finds Plaintiff has not identified evidence to establish a genuine issue of material fact regarding the issue of whether Osborn engaged in "active unconstitutional behavior" as to the April 17, 2020, use of force incident. *Bass*, 167 F.3d at 1048; *Shehee*, 199 F.3d at 300 ("[A] supervisory official's failure to supervise, control or train the offending

oversight is a textbook example of deliberate indifference as described in *Keeton*, which *found liability* where a supervisor's inadequate response to known risks demonstrated tacit authorization of unconstitutional practices." (Doc. 57, at 18) (emphasis added). But *Keeton* did no such thing. *Keeton* set forth the standard for a supervisory liability claim in the Fourth Circuit, 753 F. Supp. 3d at 450-51, and then *granted* a motion to dismiss the supervisory liability claim at issue, *id.* at 454. This is not an example of a court that "found liability".

individual is not actionable *unless* the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it.") (emphasis added) (internal quotation marks omitted). Therefore, the Court finds Osborn is entitled to summary judgment on the supervisory liability claim.

To the extent Plaintiff presents negligent hiring, negligent retention, or failure to train arguments against Osborn (*see* Doc. 57, at 18-19), the Court finds these arguments improperly conflate a supervisory liability argument with a municipal liability argument. *See Harvey*, 453 F. App'x at 563; *Miller*, 408 F.3d at 817 n.3. The Court addresses Plaintiff's municipal liability claims separately below.

### County Defendants / *Monell* Claims

Marion County, Hardin County, and MHCC move for summary judgment on Plaintiff's claims against them. They first assert the Counties themselves are not entities subject to suit (*sui juris*) under Ohio law. Second, regardless of their status, the Counties and MHCC assert Plaintiff has not presented evidence to create a genuine issue of material fact regarding a *Monell* claim. Plaintiff responds that there are questions of fact regarding his negligent hiring/retention, failure-to-train, and policy/custom *Monell* claims. (Doc. 57, at 20-21). He does not respond to the *sui juris* argument. The Court addresses each theory of *Monell* liability in turn.

Although § 1983 may be exercised against a municipality, "liability attaches only under a narrow set of circumstances[,]" and a municipality may not be held liable solely for employing a tortfeasor. *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019). "Instead, a plaintiff must show that 'through its deliberate conduct, the municipality was the moving force behind the injury alleged.'" *Id.* (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)). A plaintiff must establish the municipality had a "'policy or custom' that caused the violation of his rights." *Id.*

(quoting *Monell*, 436 U.S. at 694). A plaintiff may demonstrate that a city had such a policy or custom in four ways: "the plaintiff may prove '(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.'" *Id.* (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)). Plaintiff does not present any argument as to the first or second theory, but argues: (1) negligent hiring and retention, (2) failure to train, and (3) custom or practice. The Court addresses each theory of liability in turn.

*Negligent Hiring / Retention*

To establish a § 1983 claim for a municipality's negligent hiring and retaining of a particular employee, the plaintiff must show "that the decision to hire or retain the employee 'reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision.'" *Wilson v. Trumbull Cnty. Dep't of Job & Family Servs.*, 2013 WL 5820276, at *12 (N.D. Ohio) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 411 (1997)); *see also Stricker v. Twp. of Cambridge*, 710 F.3d 350, 365 (6th Cir. 2013) ("The standard for municipal liability in negligent hiring, training, and retention is deliberate indifference"). Put differently, a plaintiff must show that "*this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Brown*, 520 U.S. at 412.

As to Duncan's hiring, Plaintiff points to the incident in the juvenile facility and Duncan's termination from Marion Correctional Institution as "serious red flags that should have disqualified him from employment at MCCC or, at minimum, prompted heightened supervision." (Doc. 57, at 4). He contends this "negligent hiring was compounded by the testimony of Dale Osborn, who confirmed that hiring practices at MCCC lacked a formal,

standardized process, leaving decisions to the discretion of interviewers and failing to account for applicants' problematic histories." *Id.* at 20 (citing Osborn Depo., Doc. 47, at 45-46). He asserts that "[i]n *Brown v. Board of County Commissioners*, 520 U.S. 397 (1997), the Supreme Court held that municipalities could be liable when the decision to hire an unfit employee creates a foreseeable risk of constitutional harm" and hiring Duncan "placed detainees like Davis at substantial risk." *Id.* But this broadens and oversimplifies *Brown*'s holding. Indeed, *Brown* actually held:

> But this showing of an instance of inadequate screening is not enough to establish "deliberate indifference." In layman's terms, inadequate screening of an applicant's record may reflect "indifference" to the applicant's background. For purposes of a legal inquiry into municipal liability under § 1983, however, that is not the *relevant* "indifference." A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision. Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the *plainly obvious consequence* of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference."

*Brown*, 520 U.S. at 413. Liability depends not "on the mere probability that any officer inadequately screened will inflict any constitutional injury" but "must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id.* at 412; *see also Smith v. City of Troy*, 874 F.3d 938, 947 (6th Cir. 2017) (applying *Brown* standard to claim of negligent retention).

Here, Plaintiff points to two instances in Duncan's background – the juvenile facility incident and the firing from Marion Correctional. The Marion Correctional firing had nothing to do with any use of force and thus bears no relation to the injury suffered in this case. And the Court finds the juvenile court incident does not create a question of fact regarding deliberate indifference. There, although Duncan was written up for using force, he testified that "because

21

he's a juvenile, it's very like you're not supposed to touch them at all" and that the only injury the juvenile suffered was rug burn. (Duncan Depo., Doc. 51, at 15-16). That is, no reasonable jury could conclude, based on the record identified for this Court, that that incident "would lead a reasonable policymaker to conclude that the *plainly obvious consequence*" of hiring Duncan would be the alleged constitutional deprivation of excessive force at issue here. *Brown*, 520 U.S. at 413.

As to negligent retention, Plaintiff relies on the two incidents described by Sergeant Jones to the Marion Police Department. But as Defendants point out, neither of these incidents resulted in the use of force by Duncan. In the second, Duncan verbally threatened an inmate and was reprimanded for doing so. (Doc. 53-3, at 14). Although inappropriate and unprofessional, a verbal threat of violence is not the same as excessive force. In the first instance, Duncan attempted to enter a cell before being stopped by Jones. *Id.* at 13. But the only testimony the Court has regarding Duncan's intent in that circumstance is that he wanted to help the inmate. Although against policy to enter the cell, this is not evidence that the plainly obvious consequence of continuing to employ Duncan was that he would use excessive force in the future. Thus, Plaintiff has not created a genuine issue of material fact regarding whether Duncan "was highly likely to inflict the *particular* injury suffered by the plaintiff." *Brown*, 520 U.S. at 412.

Thus, the Court finds Defendants are entitled to summary judgment on Plaintiff's negligent hiring / negligent retention *Monell* claims.

*Failure to Train or Supervise*

Plaintiff asserts that "[o]nce employed, Duncan's training was grossly inadequate." (Doc. 57, at 20).

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To succeed on this theory, a plaintiff must show that "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). As the Sixth Circuit summarized:

> There are "at least two situations in which inadequate training could be found to be the result of deliberate indifference." *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003). First, and most commonly, a plaintiff can demonstrate deliberate indifference by showing that the municipality has failed to act "in response to repeated complaints of constitutional violations by its officers." *Id.* (quoting *Shaner*, 172 F.3d at 931). Under this approach, a plaintiff must show that the defendant was aware of "prior instances of unconstitutional conduct" such that it "was clearly on notice that the training in this particular area was deficient and likely to cause injury" and yet "ignored a history of abuse." *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005). This is the most common way of proving deliberate indifference.
>
> However, there is another way in which a plaintiff can show a genuine factual dispute regarding deliberate indifference. In a "narrow range of circumstances," a plaintiff can show that a municipality was deliberately indifferent by "fail[ing] to equip law enforcement officers with specific tools to handle recurring situations." *Brown*, 520 U.S. at 409, 117 S.Ct. 1382. As the Supreme Court explained in *City of Canton*, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." 489 U.S. at 390, 109 S.Ct. 1197.

*Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020).

Plaintiff does not provide evidence of "prior instances of unconstitutional conduct" putting Defendants on notice that training in this particular area was deficient. That is, he points

23

to no specific evidence of a pattern of inappropriate uses of force. Although not entirely clear, it appears Plaintiff is relying on the second way by which one can prove a deliberate indifference failure-to-train claim. Plaintiff's entire argument regarding his failure to train claim states:

> Once employed, Duncan's training was grossly inadequate, as evidenced by his own testimony. He described a cursory orientation process at MCCC that relied on a self-taught "Response to Resistance" course, which consisted of open-book exercises with little oversight or feedback (Duncan, Doc. 51, p. 32-34). He further testified that officers routinely copied each other's answers on these exams, rendering the training meaningless (Duncan, Doc. 51, p. 34). Duncan stated that no practical instruction in de-escalation techniques or conflict resolution was provided, which left him unprepared to handle detainee interactions safely. In *City of Canton v. Harris*, 489 U.S. 378 (1989), the Court recognized that a municipality's failure to train its employees adequately could amount to deliberate indifference when such omissions make constitutional violations highly likely. MCCC's reliance on inadequate, self-directed training created an environment where officers lacked the skills to protect detainee rights, directly contributing to Duncan's assault on Davis (Duncan, Doc. 51, p. 46; Davis, Doc. 46, p. 15).

(Doc. 57, at 20). On the pages Plaintiff cites in support, Duncan testified regarding: (1) an officer who discharged his firearm twice accidentally; (2) how some officers did not take the onboarding and training of new officer process seriously; (3) that Duncan wanted additional training to be able to be a transport officer; (4) that he had two refresher training courses during his time at MCCC involving suicide prevention and restraint; and (5) that he did not intend to break the law in his use of force against Plaintiff, was acting out of fear, and thought he was doing his job. (Duncan Depo., Doc. 51, at 32-24, 46). The deposition testimony cited is at best tangentially relevant to the issue at hand, and at worst the factual statements are entirely unsupported by the citations provided.[9]

---

9. For example, there is no citation provided after Plaintiff's statement that "Duncan stated that no practical instruction in de-escalation techniques or conflict resolution was provided, which left him unprepared to handle detainee interactions safely." And the citation provided for the fact that Duncan "further testified that officers routinely copied each other's answers on these exams, rendering the training meaningless" does not contain any reference to officers copying examination answers.

County Defendants have pointed to evidence demonstrating Duncan had use-of-force and de-escalation training both through his prior training and through the correspondence course at MCCC. *See* Duncan Depo., Doc. 51, at 11-12, 22-23, 111-12, 114, 156-57. And Plaintiff has not pointed to evidence to create a genuine issue of material fact on this issue. The question is not whether the Court or Plaintiff believe the training could have been better or more comprehensive, but whether "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Harris*, 489 U.S. at 390. County Defendants are entitled to summary judgment on Plaintiff's failure to train *Monell* claim.

Moreover, as County Defendants point out, even if the training were in some way inadequate, Plaintiff has not established that the training inadequacy was the *cause* of Duncan's use-of-force/Plaintiff's injury. This is so because Duncan acknowledged that he knew (based on the policies in place / his training) that he was not permitted to enter Plaintiff's cell under these circumstances. (Duncan Depo., Doc. 51, at 96, 98). That is, although Duncan testified he believed he was within his training with how he physically engaged with Plaintiff once it happened, he agreed that he acted outside of his training in entering the cell in the first place. Thus, Plaintiff has also not established an issue of fact regarding whether any alleged training inadequacy was the "moving force" behind the alleged constitutional violation. *Jackson*, 925 F.3d at 828.

*Custom or Practice*

Defendants further argue Plaintiff has not pointed to a custom or practice on which to base municipal liability. The bulk of Plaintiff's argument on this point is that Defendants created a culture within MCCC that encouraged misconduct and did not hold officers accountable.

To prevail on a theory that the County had a custom of tolerance or acquiescence to federal violations, Plaintiff must show, "(1) the existence of a clear and persistent pattern of violating federal rights . . .; (2) notice or constructive notice on the part of defendants; (3) the defendants' tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the defendants' custom was the 'moving force,' or direct causal link for the constitutional deprivation." *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007) (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996)). "A 'custom' for purposes of *Monell* liability must 'be so permanent and well settled as to constitute a custom or usage with the force of law.'" *Doe*, 103 F.3d at 507 (quoting *Monell*, 436 U.S. at 691).

Although Plaintiff's opposition brief is rife with allegations of a "toxic culture", "culture of impunity", a "broader culture of indifference", a description of MCCC as "a breeding ground for misconduct", and a reference to "longstanding patterns of excessive force", it is essentially void of specific examples or record citations to substantiate these characterizations. Indeed, Plaintiff does not cite or even describe factually in his opposition brief any other use of force at MCCC aside from the April 17, 2020, use of force at issue in this case. *See* Doc. 57. In his opposition brief, Plaintiff states the Counties "perpetuated unconstitutional customs and practices at MCCC that encouraged misconduct." *Id.* at 21. Specifically, he asserts: "Duncan testified to a pervasive 'brotherhood' culture among officers, where improper behavior was normalized,

26

reports were falsified, and supervisory accountability was minimal[.]" *Id.* (citing Duncan Depo., Doc. 51, at 40-41). He further contends "Osborn's testimony confirmed that MCCC leadership failed to establish clear policies for addressing officer misconduct and relied on an informal chain of command that lacked transparency and consistency[.]" *Id.* (citing Osborn Depo., Doc. 47, at 48-49). The cited pages of Duncan's deposition do not support the text of these sentences by any stretch of the imagination. Rather, on the first the two pages cited, Duncan described two instances where he had previously laid hands on an inmate. *See* Doc. 50, at 40-41. The quoted word "brotherhood" does not appear anywhere on the two pages. Although the cited pages of Osborn's deposition come closer, they similarly do not support the sentence they are offered to support. Osborn testified regarding the steps he took as Director regarding new hires:

> Q:  As executive director of the Multi-County Corrections Center what steps did you take to ensure that new hires were receiving what you felt was proper training during the new employee orientation?

> A:  Consultation with Captain Romine in some cases. In other cases I trusted Captain Romine to ensure that this was getting done.

> Q:  In terms of the response you just gave you said in some instances you would consult with her and in other instances you would just trust her. How would you determine whether you needed to consult with her further?

> A:  I would sometimes talk to her about where we were at with the training on certain individuals, has it gotten completed yet.

> Q:  With regard to Tyler Duncan do you recall having any statements – excuse me, any conversations with Captain Romine regarding Tyler Duncan's training?

> A:  No.

> Q:  Do you recall having any conversations with Lieutenant McCullough regarding Tyler Duncan's training?

> A:  No.

Q:    Do you recall having any conversations with anyone employed within the Multi-County Corrections Center regarding Tyler Duncan's training?

A:    No.

Q:    Do you recall having any conversations with anyone within the Multi-County Corrections Center regarding Tyler Duncan's previous work history?

A:    No.

Q:    Do you recall having any conversations with anyone within the Multi-County Corrections Center regarding Tyler Duncan's hiring?

A:    I do not recall.

(Osborn Depo., at 49-50). This is not testimony about the "fail[ure] to establish clear policies for addressing officer misconduct." (Doc. 57, at 21). Plaintiff then refers to this as a "culture of impunity" which "aligns with the court's findings in *Dillon v. Hamlin*, 718 F. Supp. 3d 733 ([S.D. Ohio] 2024), where a municipality was held liable for maintaining a custom or practice of tolerating unconstitutional behavior." *Id.* But *Dillon* held no such thing. In fact, in *Dillon* the court *granted* a motion to dismiss finding the plaintiff did not plausibly allege the existence of an official policy. *Dillon*, 718 F. Supp. 3d at 740 ("But the Complaint cites no specific, official policy of the Lawrence County Sheriff's Department that Dillon says led to her injuries. It only offers vague and conclusory allusions to 'customs' and 'policies.'").

Elsewhere in his opposition brief, Plaintiff alleges that there was a "culture built on mutual protection, discouraging officers from reporting or challenging misconduct by their peers" and that "officers who engaged in excessive force or other unethical behaviors were shielded from consequences through a combination of manipulated reports, intentional avoidance of surveillance cameras, and collective silence." (Doc. 57, at 10). But Plaintiff fails to identify the supporting evidence in the record. And Defendants identify testimony to the contrary. *See*

Doc. 59, at 7 ("Plaintiff claims, without support, that there was a pattern of falsifying reports, but the available testimony directly contradicts such an assertion.") (citing Phillips Depo., Doc. 48, at 40-41 (describing proofreading other officer's reports for accuracy); High Depo., Doc. 50, at 21, 26, 32-33 (describing how she "was going to write in [her] report exactly what [she] saw and [she] heard that day", that her report was not edited or changed, and describing that she had never been instructed to, nor had, spoken to other officers about collaborating on reports); Duncan Depo., Doc. 51, at 138-39 (stating that no one told him what to write in his report)). At best (and Defendants – not Plaintiff – identify Duncan's testimony on this issue), Duncan testified that he "believe[d]" there was a use of force report written about an incident in booking and was "pretty sure [they] all fibbed." (Duncan Depo., Doc. 51, at 62). However, when asked if there "were . . . other situations where officers fibbed", he said "[f]rom what I seen that was really the only one." *id.* at 65. Plaintiff has failed to identify evidence that there was a pattern or culture of falsifying reports. Moreover, even if he had, he fails to draw a causal connection between any such unsupported allegation and the use of force incident at issue in the present case. That is, he has not shown that any supposed custom of falsifying reports "was the 'moving force,' or direct causal link for the constitutional deprivation." *Powers*, 501 F.3d at 607.

Plaintiff's allegations about officers avoiding surveillance cameras fare similarly. First, he has not pointed to any evidence to support the allegation. Again Defendants have identified evidence to the contrary, or at least that does not rise to the level Plaintiff alleges. *See* Doc. 59, at 8. In one instance, Plaintiff described being asked to watch the door and stated it was "[s]o no one saw. There's no cameras in the bathroom." (Duncan Depo., Doc. 51, at 50). But then when asked whether it was "commonplace to try to avoid cameras while undertaking certain acts", he said "I wouldn't say avoid it." *Id.* Osborn also testified that he was not aware of any correctional

officer intentionally taking an inmate outside of the view of cameras in order to use force against them. (Osborn Depo., Doc. 47, at 127). Thus, even examining this evidence, at best, Plaintiff has identified a single instance of officers avoiding cameras. This is not sufficient evidence on which a jury could find a custom that is "so permanent and well settled as to constitute a custom or usage with the force of law." *Monell*, 436 U.S. at 691.

Next, Plaintiff alleges there was a pattern of correctional officers at MCCC "boasting about unconstitutional actions without repercussions" (Doc. 57, at 17) and that officers relied on "collective silence." *Id.* at 10. He references Cox's testimony "about Duncan's post-incident Snapchat messages, where he boasted about the assault and sought to manipulate evidence" as "further underscor[ing] the pervasive culture of impunity at MCCC." *Id.* at 4; *see also id.* at 6, 11 (referencing messages). But both Cox and Philips reported Duncan's messages. *See* Cox Depo., Doc. 49, at 19; Phillips Depo., Doc. 48, at 43. This is not evidence of officers covering up misconduct.

Duncan testified about, and County Defendants summarized, three instances of other officers using force and that officers sometimes entered inmate cells to scream at them and sometimes slammed them up against the wall or to the ground. *See* Doc. 53, at 22-23 (citing, *e.g.*, Duncan Depo., Doc. 40, 51, at 50-53, 126-29). Plaintiff does not point to any of these instances specifically. But even if he did, the Court agrees with the County Defendants that they do not create a question of fact regarding "a clear and persistent pattern" of violating federal rights. *Doe*, 103 F.3d at 508. Again, "[a] 'custom' for purposes of *Monell* liability must 'be so permanent and well settled as to constitute a custom or usage with the force of law.'" *Id.* at 507 (quoting *Monell*, 436 U.S. at 691). Nor has Plaintiff pointed to evidence demonstrating that the County Defendants had notice of these actions or gave "tacit approval of the unconstitutional

30

conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction". *Id.*

In conclusion, the Court finds Plaintiff has not pointed to evidence to establish a genuine issue of material fact regarding his claims against the Counties or MHCC.[10] Although there are some instances of identified inappropriate behavior or alleged misconduct at MCCC, Plaintiff has not created a question of fact regarding a deliberate indifference *Monell* claim for the reasons set forth above. To say the County Defendants are entitled to summary judgment is not to condone Duncan's actions or to determine MCCC is following best practices, but only to say Plaintiff has not established question of fact regarding a violation of constitutional magnitude as to the Counties and MHCC.

### Punitive Damages

Punitive damages are appropriate in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *King v. Zamiara*, 788 F.3d 207, 216 (6th Cir. 2015) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Because the Court finds County Defendants are entitled to judgment on all claims against them, Plaintiff cannot establish entitlement to punitive damages.

### CONCLUSION

For the foregoing reasons, good cause appearing, it is

---

10. Because the Court finds the County Defendants substantively entitled to summary judgment on Plaintiff's *Monell* claims, it declines to address the County Defendants' alternative argument that Marion and Hardin Counties are not *sui juris* or that only MHCC, not the Counties, can be held liable here. Regardless of which Defendant the *Monell* claim is properly directed at, it is entitled to summary judgment.

ORDERED that Plaintiff's Motion for Leave (Doc. 60) be, and the same hereby is, DENIED; and it is

FURTHER ORDERED that Defendants Hardin County, Marion County, Dale R. Osborn, Brandon Taylor, and Marion-Hardin Correction Commission's Motion for Summary Judgment (Doc. 53), be and the same hereby is, GRANTED.


_s/ James R. Knepp II_
UNITED STATES DISTRICT JUDGE

Dated: June 23, 2025